442 F.2d 812
 BANGOR AND AROOSTOOK RAILROAD COMPANY et al.
v.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant.
BANGOR AND AROOSTOOK RAILROAD COMPANY et al., Appellants,
v.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Appellant,
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN
v.
The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Appellants.
 Nos. 24521-24524.
 United States Court of Appeals, District of Columbia Circuit.
 Argued December 4, 1970.
 Decided February 19, 1971.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. John Silard, Elliot C. Lichtman, Washington, D. C., Daniel H. Pollitt, Chapel Hill, N. C., and Isaac N. Groner, Washington, D. C., were on the brief, for appellant in Nos. 24,521 and 24,523 and appellee in Nos. 24,522 and 24,524.
 Mr. Francis M. Shea, Washington, D. C., with whom Mr. Richard T. Conway, Washington, D. C., was on the brief, for appellees in Nos. 24,521 and 24,523 and appellants in Nos. 24,522 and 24,524.
 Before DANAHER, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 These appeals arise from an action by the Brotherhood of Railroad Firemen and Enginemen (BLFE) for damages sustained as a result of the carriers' wrongful blanking of fireman positions in the "full crew" states of Washington and Oregon.
 
 
 General Background
 
 
 2
 The background of this case is set out in considerable measure in our Akron opinion, Brotherhood of Railroad Trainmen v. Akron & B.B.R.R., 128 U.S.App. D.C. 59, 385 F.2d 581 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).
 
 
 3
 The 1950 National Diesel Agreement between the BLFE and the carriers provided for the employment of firemen on virtually all diesel-powered locomotives. In addition, several states, including Washington and Oregon, had so-called full crew laws which, among other things, specified that in defined circumstances the engine crew of locomotives must include a fireman. These laws were enacted before the advent of diesels, and generally contained no exemption for that type of locomotive.
 
 
 4
 The carriers proposed, and the BLFE resisted, the virtual elimination of firemen's jobs on freight and yard (but not passenger) service. When a national rail strike threatened, Congress in 1963 enacted Public Law 88-108, 77 Stat. 132, and established an independent board of arbitrators (Board No. 282) with authority over the manning dispute.
 
 
 5
 Award No. 282 relating to the use of firemen modified the National Diesel Agreement so as to allow the carriers to establish work rules dispensing with firemen positions in freight and yard service, by use of a procedure for carrier listing ("blanking") of the crews where firemen positions could be dispensed with, and BLFE retention, by veto, of 10% of the positions listed in each seniority district. During the period of the Award, more than 18,000 firemen were "pruned" from the ranks.
 
 
 6
 Although Award 282 was promulgated pursuant to Federal statute, the Supreme Court held that state full crew laws had not been pre-empted.[1] When Award 282 expired, on March 31, 1966, full crew laws were in effect in Oregon and Washington. The repeal of these laws was effective on January 1, 1967 in Oregon and December 9, 1966 in Washington. Both the BLFE and the Carriers filed suit for a declaration of their rights. The carriers claimed the Award's procedures continued in effect, after its expiration date, permitting them to eliminate firemen positions in the states subsequent to repeal of the full crew laws. The BLFE argued that once Award 282 expired, the National Diesel Agreement was restored to full force and effect, obligating the carriers to reinstate the positions eliminated under the Award.
 
 
 7
 In the District Court, Judge Holtzoff held that the carriers could discontinue the use of firemen on blankable runs, even after the Award's expiration, by failing to replace firemen who retired, died, or resigned. On the other hand, the carriers could no longer blank runs through "affirmative acts," i. e., could not separate any additional firemen from employment or offer comparable jobs as had been permitted under the Award as to firemen with less than ten years' seniority. Bangor & Aroostook R. R. v. BLF&E, 253 F.Supp. 682 (D.D.C.1966).
 
 
 8
 As to the repeal of full-crew laws in Washington and Oregon, Judge Holtzoff ruled that this would not permit the carriers to eliminate fireman positions affirmatively after the expiration of the Award, even though the full crew laws had prevented them from doing so during the period of the Award. "Since the effective period of the Award has expired, no affirmative steps may be taken under it. * * * The situation must be deemed frozen as of the close of the effective period of the Award." 253 F.Supp. at 687.
 
 
 9
 Again, however, the District Court distinguished a mere failure to fill vacant positions: "This is entirely different from the converse ruling that no vacancies occurring by attrition after the termination date need be filled. In other words, there is no right or duty to take any affirmative step under the Award on the part of either side after the crucial date." Id.
 
 
 10
 On appeal, in our Akron ruling, supra, this court modified the judgment of the District Court. We held:
 
 
 11
 "[A] carrier is not only prevented from taking `affirmative acts' under the Award to reduce the use of firemen, as the District Court properly held, but also, if the carrier was required to keep a fireman on a particular crew as of the last day of the Award, it cannot thereafter change the work rule by discontinuing that position, except by agreement or in accordance with Section 6. The work rule that continues in force provides for a fireman on this crew, and that is not changed because the particular fireman on duty dies or retires." 128 U.S.App.D.C. at 89, 385 F.2d at 611.
 
 
 12
 We further held that the repeal of full crew laws in Washington and Oregon subsequent to the expiration of the Award did not permit the blanking of runs in those states, either affirmatively or through failure to fill positions vacated by attrition.[2] On May 29, 1968, after the Supreme Court had denied certiorari (390 U.S. 923, 88 S.Ct. 851) the District Court entered a new judgment which "reaffirmed and reentered" its May 12, 1966, judgment, as modified "by the opinions and judgment" of this court.
 
 
 13
 After attempting, unsuccessfully, to obtain further consideration from Board 282, the carriers sought from Judge Holtzoff a supplemental declaration that the full crew laws would operate to block Award 282 in full crew states only if these full crew laws were constitutional, and that if not, the carriers could blank runs in those states as though the full crew laws had never been passed. This issue was mooted, however, on November 18, 1968, when the Supreme Court affirmed the constitutionality of the Arkansas full crew law. BLF & E v. Chicago, R.I. & P.R.R., 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968).
 
 
 The Instant Dispute
 
 
 14
 The dispute arises from the fact that between the effective date of the Washington and Oregon full-crew repeals (December 9, 1966, and January 1, 1967), and the November 18, 1968, decision of the Supreme Court the carriers refused to fill fireman positions in those two states as they became vacant because of natural attrition. Mr. John P. Hiltz, Jr., Chairman of the National Labor Conference, estimates that the Great Northern blanked 49 positions in those states during that period; the Milwaukee, 39; Southern Pacific, 50; and Union Pacific, 45. (App. 27-28). Mr. Hiltz further estimates that the cost to the carriers in filling these positions would "amount to $150,000 or more per month in wages and other expenses." Id.
 
 
 15
 On September 16, 1968, the BLFE filed a motion for accounting and other appropriate relief. This motion sought, first, the names of firemen who would have been employed had the carriers filled positions in Washington and Oregon and an order requiring the carriers to pay these firemen their lost wages plus interest. Second, the motion sought an accounting of the total wages saved by the carriers as a result of these blankings, and an order requiring the carriers to pay this amount, less damages paid to individual firemen, to BLFE itself for distribution to the appropriate class of firemen, or for use to the benefit of firemen generally. Third, BLFE requested that the carriers be ordered to pay to it the amount of dues, assessments, initiation fees, and other payments which would have been paid to it were it not for the blankings. Fourth, the motion sought an order requiring the carriers to pay reasonable costs, including attorneys' fees arising out of the blankings. Fifth, and finally, BLFE requested the court to order the carriers to file with the court a report of the steps taken by them to ensure the employment of firemen in Washington and Oregon as required by previous court orders.
 
 
 16
 The District Court entered an opinion and order on May 21, 1970, 314 F.Supp. 352.[3] It held, first, that the carriers had abolished jobs in Washington and Oregon in violation of this court's previous decision, and that they must "continue to use firemen as required by the National Diesel Agreement until changed by agreement of the parties or pursuant to Section 6 of the Railway Labor Act." The court also declared that if any fireman had been deprived of employment as a fireman by reason of illegal blanking, he was entitled to reinstatement and could present any claim for damages to an adjustment board pursuant to Section 3 of the Railway Labor Act. However, the court denied any recovery to BLFE itself, either for its attorneys' fees and loss of dues, etc., or for distribution to its members.
 
 
 17
 Finally, Judge Corcoran ruled that two carriers — the Spokane, Portland, and Seattle Railway Co., and the Northern Pacific Railway Co. — had absolved themselves, in agreements with BLFE, from the obligation to use firemen in Washington and Oregon, except "as specified in those agreements."
 
 
 18
 These cross-appeals followed the denial of the carriers' motion for clarification of the May 21 order. We reverse in part. We hold that BLFE is entitled to recover the amount of dues, assessments, initiation fees and other payments which it would have received were it not for the carriers' illegal blankings in Washington and Oregon. We affirm the ruling precluding recovery by the Brotherhood on behalf of its members as a class, of monies that may have been saved by the carriers as a result of this violation. We likewise affirm the ruling with respect to the Northern Pacific Agreement.
 
 
 Jurisdiction
 
 
 19
 The carriers argue that the courts lack jurisdiction over the claims asserted by BLFE, that what is involved is a mere contract dispute, and that Section 3 adjustment boards have exclusive jurisdiction over such disputes between labor and management in the railroad industry. We agree with the carriers that Section 3 of the Railway Labor Act gives exclusive jurisdiction to the adjustment boards to consider those minor disputes between carriers and unions that are based on the provisions of a collective bargaining agreement.[4] However, the present case involves more than a mere disagreement over contract terms and we find jurisdiction to consider the Brotherhood's claims.
 
 
 20
 The carriers lean on the statement in our Akron opinion, supra, that the work rules resulting from Award 282 "are deemed to be incorporated into the prior agreements of the parties [the National Diesel Agreement] that themselves endure by virtue of the Railway Labor Act unless and until changed in accordance with that statute." 128 U.S.App. D.C. at 87, 385 F.2d at 609.
 
 
 21
 While this argument has some appeal in terms of logic, we think it without merit in the light of underlying realities. The basic dispute which brought the parties to this court was not a dispute over the meaning of a contract, but over the impact of Award 282 — whether and to what extent it modified the National Diesel Agreement. Having assumed jurisdiction over that dispute, we retain jurisdiction to ensure compliance with the decree resulting from our decision in that case. This is so although we resolved the dispute by an analysis that the work rules resulting from Award 282 "are deemed to be incorporated into the prior agreements of the parties," here the National Diesel Agreement. In a sense it is true that the carriers may be deemed to have violated the Agreement. It is also true that their violation was in contravention of the definition of their obligation provided by our ruling in Akron.
 
 
 22
 The applicable principle was outlined in Southern Pacific Co. v. BLF & E, 129 U.S.App.D.C. 236, 393 F.2d 345 (1967), cert. denied, 391 U.S. 913, 88 S.Ct. 1803, 20 L.Ed.2d 651 (1968). There the District Court had enjoined a strike over a dispute concerning Award 282, but reserved jurisdiction for any of the parties "`to apply to this Court at any time for such further orders as may be necessary or appropriate for the * * * enforcement of this order * * * or any legal obligation resulting therefrom.'" 129 U.S. App.D.C. at 237, 393 F.2d at 346. Thereafter the union filed a motion with the District Court for damages for alleged violations of Award 282 by the carrier. The District Court granted the requested relief, and the carrier appealed, on the ground that "these claims of alleged violations of the Award must be processed pursuant to the procedures of Section 3 of the Railway Labor Act." In rejecting this contention we held (129 U.S.App.D.C. at 238, 393 F.2d at 347):
 
 
 23
 Even assuming * * * that the carriers are right that these claims are minor disputes for which the contract provided a usual procedure within Section 3 of the Railway Labor Act, the district court did not abuse its discretion in establishing a condition that employees injured by misapplication of the award have available a judicial remedy, and do not have to wait years for Adjustment Board vindication.
 
 
 24
 We are aware that in Southern Pacific the Award itself formed the basis of the union's claim, and that the decision did not focus "on the legal constructs applicable to the period following the expiration of the Award." 129 U.S.App.D.C. at 239, 393 F.2d at 345. However, the underlying principle, as appears from the language quoted above, is clear that the courts may assume jurisdiction over claims for damages sustained through violation of their decrees, even though the claims might at the same time be characterized as minor disputes subject to the jurisdiction of a Section 3 Board. Where the elements of contract interpretation are obvious or subordinate they cannot fairly be permitted to control the issue of judicial jurisdiction. A similar approach was followed in the first Galveston Wharves case, United Indus. Workers of Seafarers, etc. v. Bd. of Trustees of the Galveston Wharves, 351 F.2d 183 (5th Cir. 1965), where the court reached a question of contract interpretation in order to decide whether the dispute before it was major or minor. The exclusive jurisdiction of Section 3 boards over contract claims will not be taken as precluding a court's exercise of jurisdiction on bases other than resolution of contract disputes merely because of the possible existence of ancillary or concurrent contract issues.
 
 
 25
 Similarly we reject the carriers' contention that these claims are barred by the union's failure to comply with the grievance procedures set forth in Section 17 of the 1948 Agreement. "[T]here is sound equitable basis for omitting the claims-and-grievance procedure established in 1948 and 1949 agreements, even assuming its applicability. Concepts of exhaustion of remedies will not be pursued with remorseless logic, at least in situations not fairly contemplated when the remedies were established, when the consequence would contravene basic expectations of justice by mandating a futile or unduly protracted procedure." Southern Pacific, supra, 129 U.S.App.D.C. at 239, 393 F.2d at 348.
 
 
 26
 The District Court recognized that firemen who had been deprived of employment by the carriers would have a valid claim for damages, but it relegated these individuals to the Section 3 Boards, on the ground that "it would be an unreasonable burden for the Court to compute the hundreds of claims that will most likely be made." We regard this as sound. The fact that the district court has jurisdiction over these claims does not mean that the jurisdiction must in all cases be exercised. Where, as here, the claims may be numerous and complex, the court's action in deferring to administrative expertise, and manpower, for their resolution, is a sound exercise of the doctrine of primary jurisdiction.
 
 
 Damage Claims
 
 
 27
 We now turn to BLFE's claim that it should recover, on behalf of its members, the amount saved by the carriers through their illegal blanking of runs in Washington and Oregon through a "negative" failure to hire rather than "affirmative" dismissals and transfers. The mechanics of this negative blanking mean that there will be "few or no firemen who could show individual earnings losses" as a result of these violations. Therefore, according to BLFE, unless recovery is established for the benefits of firemen generally, the carriers will retain the fruits of their own illegal acts as a windfall. Rather than permit this result, the Brotherhood urges that we avoid this result as against sound policy and instead devote these funds to benefit the class most nearly approximating those harmed — namely, the firemen.
 
 
 28
 This is not a case where the court can say with reasonable confidence that the class of injured persons coincides in substantial part with the membership of the Brotherhood, or firemen as a whole. If such an assumption could be made BLFE's request could be supported as providing an effective means of compensating those who, by hypothesis, were the victims of the carriers' illegal acts. In the present case, however, there is not a sufficient showing of identity between the victims and the intended beneficiaries to justify an award on that basis.[5]
 
 
 29
 The law of class recovery is in flux. The courts are ready to apply bases of recovery with reasonable liberality in order to serve the objectives of the law. Thus, in Bebchick v. Public Utilities Comm'n, 115 U.S.App.D.C. 216, 318 F.2d 187, cert. denied, 373 U.S. 913, 83 S.Ct. 1304 (1963), this court, finding a past transit fare increase to be excessive, ordered Transit to set aside the overcharges as a fund, to be used for the benefit of future transit riders. The theory of the Order was that there was a reasonable continuity and equivalence between the class of persons injured — those riders who had paid the overcharges in the past — and the class of riders who would receive the benefits of the fund in the future, in the form of improvements, lower rates, etc. The two classes would not be identical, of course, since some riders would cease to use the transit, and new riders would replace them. In other contexts the difference in these classes might loom large. But in the context of avoiding carrier retention of fares unlawfully charged and compensating those victimized by the unlawful action there was sufficient relationship and overlap of classes to permit a judgment that the compensation inure in substantial measure to the class of those who had suffered harm.
 
 
 30
 It would extend Bebchick unduly to permit a class recovery in the case at bar on the theory of compensation for damage suffered by a class. The persons who suffered primary damage from the carriers' violations are the men who would have been hired on the blanked runs.[6] Those who "would have been" hired are a class that is essentially indeterminate and indeterminable. By the Brotherhood's own admission, the additional positions would have been filled "from the streets." We have no way of knowing who was harmed by the violations, and whether any, or how many, of these persons are now working as firemen or are Brotherhood members. We cannot determine what relation if any exists between the class of persons harmed by the carriers' actions and those who would benefit from recovery of the savings by the Brotherhood, or its members, or all those who are presently firemen.
 
 
 31
 "A person is not permitted to profit by his own wrong at the expense of another." Restatement, Restitution (Quasi Contracts and Constructive Trusts) § 3. But in general the law has not yet come to the point of awarding judgments based on unjust enrichment for the benefit of a suitor who has not established any harm to himself or his class. If there is such harm there are doctrines permitting the recovery to exceed the loss to plaintiff and equal the unjust gain realized by defendant, but even this is normally permitted only when defendant stands condemned of "consciously tortious conduct." Restatement, Restitution (Quasi Contracts and Constructive Trusts) § 151. There is also doctrine requiring an agent or person with fiduciary responsibility to account to his principal or beneficiary for all of the gains, benefit or enrichment he obtained by use of the property of his beneficiary or other breach of his duty as fiduciary. See Restatement, Restitution (Quasi Contracts and Constructive Trusts) § 138. But such fiduciary doctrine is far removed from the underlying legal relationship before us. Nor do we think that the carriers have acted so unreasonably as to warrant assessment of punitive damages, or to justify the recovery sought by BLFE by analogy to an amount of punitive damages.[7]
 
 
 32
 
 Recovery by Brotherhood for loss of dues, assessments, initiation fees
 
 
 
 33
 This does not mean that the carriers will retain all the fruits of their violation. Recovery will be allowed to take account of the damage sustained by the Brotherhood as a result of these violations in the loss of the dues, assessments, initiation fees, and other payments which would have been made to BLFE if additional firemen had been employed on the illegally blanked runs. The carriers argue that there can be no showing of loss by BLFE because it is not certain that the additional firemen, when hired, would join the BLFE rather than one of the other firemen's unions which would satisfy the union shop clause of the agreement. There may well be an element of uncertainty in the precise amount of damage sustained by the Union. But established principle dictates that the burden of that uncertainty must fairly rest on the wrongdoer. Where the wrongdoing is "of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."[8] That principle is applicable with full vigor when, as in the case of these carriers, the wrongdoing resulted in an increase in their profits far in excess of the maximum damages that could be allowed to BLFE. It seems reasonable to limit the setoff for the possibility of nonjoinder of BLFE by reference to the conditions of union membership of other firemen on these carriers, or of those ultimately hired in 1969 to man the Washington-Oregon jobs.
 
 
 34
 The amount of dues and payments for which BLFE must be compensated is to be calculated from the date of the Award's expiration, since the blanking of runs in Washington and Oregon was illegal after that date. The carriers seem to argue their liability should be limited to the period following the Supreme Court's November, 1968, Rock Island decision on the ground that they had a right to litigate the full crew issue through the Federal courts, and to maintain "the status quo" pending final disposition by the Supreme Court.
 
 
 35
 An award of damages does not constitute a denial of any right of the carriers to litigate. The fact that the carriers presented reasonable arguments was cited above as a reason for not imposing punitive damages. But the right to litigate is not a right to "a free ride during the period of litigation"[9] that relieves the carriers of their duty to compensate those damaged by their wrongs. The carriers were incorrect in their premise that they could blank runs after the Award expired and they must make compensation for damage sustained as a result of their erroneous premise.
 
 
 36
 The Brotherhood's recovery also entitles it to reimbursement of appropriate expenses of litigation but not, we think, to attorneys' fees. Attorneys' fees are not recoverable as a general rule. There are exceptions. A notable exception applies where "a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself." Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970). The allowance may take into account the public interest in preventing or rectifying the wrong. Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968). But the provision for attorneys' fees is designed primarily not as an additional recovery against the wrongdoers, but as a means of ordering compensation to counsel from the class benefited.[10] Since we have rejected BLFE's claim for class recovery, this principle is inapplicable.
 
 
 37
 The general rule against allowance of attorneys' fees is also subject to another, and narrow, exception derived from the power of equity courts to tax attorneys' fees "in exceptional cases and for dominating reasons of justice," Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 167, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939); Fleischmann Distilling Corp. v. Maier Brewing, 386 U.S. 714, 717-719, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Outside of litigation involving benefit to a class, the Sprague exception seems to have been invoked for the most part in extraordinary cases involving such elements as fraud, oppression, bad faith in a fiduciary relationship, and also obstructiveness in recognition of rights, and wanton or vexatious litigation. Bell v. School Bd of Powhatan Cy., 321 F.2d 494 (4th Cir. 1963); Cleveland v. Second Nat'l Bank & Trust, 149 F.2d 466 (6th Cir.), cert. denied, 326 U.S. 775, 66 S.Ct. 231, 90 L.Ed. 468 (1945). This exception would not be considered applicable where litigation was pursued on a matter as to which prior decisions left a lingering doubt. Local 149, UAW v. American Brake Shoe, 298 F.2d 212 (4th Cir.), cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962). While any doubts of the carriers do not excuse failure to comply with outstanding orders, we cannot say that their pursuit of litigation with the union, which required services of its attorneys, calls for extraordinary measures, and conclude that the interest of justice is served by compensating BLFE on reasonable proof of damages sustained without special provision for attorneys' fees.[11]
 
 
 38
 We think sound principles of judicial administration call for the Brotherhood's claim to be determined by the District Court. With the basic principle determined in this opinion we anticipate that procedures for computation can readily be established, hopefully by agreement, and if not, by appropriate order of the District Court.[12]
 
 
 The Northern Pacific Agreement
 
 
 39
 The District Court ruled that the Brotherhood's agreements with the Northern Pacific and with the Spokane, Portland & Seattle roads established new work rules which modified the National Diesel Agreement, and that firemen need be used on those lines only as specified in the agreements. The Brotherhood does not challenge the SP & S ruling. However, it claims that the agreement it entered into with Northern Pacific on January 9, 1968, effective March 16, 1968, was intended only as an interim measure pending judicial resolution of the full crew issues, and that it does not affect the carriers' liability for violating our 1967 decision concerning the use of firemen in Washington and Oregon.
 
 
 40
 If this were the only issue in the case it might more properly be remitted to a Section 3 adjustment board, since it is almost exclusively one of contract interpretation. However, the issue is closely related to those already considered, and hence we think it appropriate to exercise judicial jurisdiction, along principles analogous to pendent jurisdiction, and affirm the ruling of the District Court.[13]
 
 
 41
 The case is remanded to the District Court for further proceedings not inconsistent with this opinion.
 
 
 42
 Remanded.
 
 
 
 Notes:
 
 
 [1]
 Brotherhood of Locomotive Engineers v. Chicago, R. I. & P. R. R. 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 591 (1966)
 
 
 [2]
 "The Board authorized the carriers to list jobs for blanking, and thus provide a classification `when and if such full crew laws are amended or repealed.' * * * But this conditional blanking was only available as an advance procedure made fruitful if the necessary condition materialized during the 2-year lifetime of the Award." 128 U.S.App.D.C. at 89-90, 385 F.2d at 611-612
 
 
 [3]
 This motion was originally heard by Judge Holtzoff, who in March, 1969, requested the parties to submit proposed orders. These orders were not submitted until September, 1969, after the breakdown of negotiations regarding a new national agreement. In November, 1969, after Judge Holtzoff's death, the case was assigned to Judge Corcoran, who, after denying BLFE's motion to hear the case himself, adopted the findings of Judge Holtzoff in large part
 
 
 [4]
 See, e. g., Slocum v. Delaware, L. & W. R. R., 339 U.S. 239, 70 S.Ct. 577, 94 L. Ed. 795 (1950). Section 3 relates to disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153, First (i).
 
 
 [5]
 The cases cited by BLFE concern plaintiffs who could show some sort of injury at the hands of the defendant, and the issue was whether the speculative character of that injury precluded the award of compensatory damages. Anderson v. Mt. Clemons Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (Earnings lost through employer's violation of Fair Labor Standards Act); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (Lost profits due to illegal licensing practices) ; Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944) (Union majority lost through employer's refusal to bargain); Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942) (Trademark infringement); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (New entrant driven out of market); Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L. Ed. 1222 (1912) (Patent infringement); IUERMW [Tiidee Products] v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970) (Refusal to bargain, loss of benefits that might have been gained by employees in negotiated agreement); Bebchick v. Public Utilities Comm'n, 115 U.S.App.D.C. 216, 318 F.2d 187, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963) (Excessive bus fares)
 In several instances the Supreme Court has permitted recovery for overcharges in commercial sales, due to price-fixing or otherwise, even though the plaintiff-buyer had passed on the loss to his customers. See, e. g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932); Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918). The Supreme Court has justified this recovery, however, on the ground the plaintiffs had in fact incurred a loss, whose character was not changed by the mere fact of being passed on. "[H]ere the plaintiffs have paid cash out of pocket that should not have been required of them, and there is no question as to the amount of the proximate loss." Darnell-Taenzer, supra, at 534-535, 38 S. Ct. at 186.
 In some instances the defendant's gain was held to be the measure of damages because of the difficulty in ascertaining any other reasonable figure. Even in those cases, however, the injury was done to the particular plaintiff on approximate class of plaintiffs. See, e. g., Westinghouse Electric & Mfg. Co., supra.
 
 
 [6]
 As for the occasional fireman who may have been wrongfully discharged or transferred he may seek compensation as outlined above
 
 
 [7]
 While the Brotherhood does not use the term punitive damages, it seeks to impart that flavor to the case by asserting that the carriers have acted in contempt of the May, 1966, District Court order, and have used litigation solely as a means of forestalling compliance with the clear requirements of that Order. We disagree. Judge Holtzoff did say on May 12, 1966, that firemen positions "must not be abolished but must be kept going," but we think it clear that Judge Holtzoff did not intend his order to reach mere refusal to fill vacancies. To be sure, this court modified the opinion of the District Court so as to reach both affirmative and negative blankings. However, we cannot say that the carriers, in seeking review, and then in raising the question of applicability to unconstitutional full crew laws, are to be identified as having acted in bad faith. Although its decision was later reversed, the District Court for the Western District of Arkansas had declared full crew laws unconstitutional on commerce and due process grounds. Chicago, R. I. & Pacific R. R. v. Hardin, 274 F.Supp. 294 (W.D.Ark.1967), rev'd sub nom. BLF & E v. Chicago, R. I. & Pacific R. R., 393 U. S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968). The carriers must make compensation to those injured by their wrong, and assume some burden of doubt as to the extent of injury, but they are not to be subject to special rules of damages on ground of bad faith
 
 
 [8]
 Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). And see Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Espaillat v. Berlitz Schools, etc., 127 U.S.App.D.C. 293, 383 F.2d 220 (1967), 24 A.L.R.3d 1380, 1415 n
 The carriers must bear the burden of showing, if they can, that the initiation fees cannot be allowed to BLFE because the men who would have filled the positions unlawfully blanked, and paid those fees to BLFE, did in fact fill such positions after November 18, 1968. To the extent that the carriers assert such a defense as to BLFE they obviously open themselves up to claims by the men identified for wages lost during the period they were not hired by the carrier.
 
 
 [9]
 IUERMW [Tiidee Products] v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, 1251, cert. denied, 400 U.S. 950, 91 S.Ct. 239 (1970)
 
 
 [10]
 The principle whereby attorneys' fees were made payable from the "common fund," produced for the benefit of the class has been expanded to apply where there have been other benefits, Mills v. Electric Auto-Lite,supra. Schmidt v. McCarthy, 125 U.S.App.D.C. 131, 369 F.2d 176 (1966). As Mills points out (396 U.S. at 393-394, 90 S.Ct. at 626) the allowance operates "to permit reimbursement in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them * * regardless of whether an actual money recovery has been obtained."
 
 
 [11]
 To obviate any misunderstanding we emphasize that we are not in this paragraph discussing the possibility of attorneys' fees in suits maintained for the benefit of a class
 
 
 [12]
 We agree with the carriers that the Brotherhood has not, at least as of the present time, established a basis for its motion for accounting. Information as to damages is presumably available through the normal channels of discovery
 We have no occasion at this juncture to consider whether the case may come to require supplementary procedures, perhaps even a master to facilitate expeditious and orderly resolution of the present dispute.
 
 
 [13]
 The Brotherhood relies on a provision of Section 15 of the Memorandum, "[N]othing in this agreement will prejudice the position of any party in any litigation or pending Section 6 notices involving the issues in Award 282." It also relies on the contemporaneous notes and subsequent affidavit of its chairman Howard E. Ritter, who stated that it "was clearly said and agreed that the BLF&E would have the benefit on the NP of the legal resolution of the full-crew-repeal issues which would be applicable generally to the other carriers in Washington and Oregon — the Agreement would not affect this." BLFE contends that the Agreement is applicable in Washington and Oregon only insofar as it is not inconsistent with "final judicial resolution of the full crew issues."
 The carriers argue that Section 15 meant only that the agreement would not be used to the general embarrassment of the Brotherhood or the many carriers with whom it was involved in litigation and negotiations over the manning issues.
 The agreement gave BLFE and the firemen certain rights to which they were not entitled under Award 282. Section 14 provided that either party could cancel the agreement, on 30 days notice, and this would reinstate Award 282. Although the Savings Clause of Section 15 is ambiguous, we find it persuasive in NP's favor that the Memorandum of Agreement was to provide "uniformity in * * * administration" for the original Memorandum of Understanding, and that in defining "must-fill" positions as passenger or hostler runs it made no special provision for runs in Washington and Oregon. The District Court noted that since the effective date of the Agreement, "both sides have acted as if the National Diesel Agreement was modified and have looked to the January 1968 Agreement (and later supplements) to determine whether or not firemen had to be used on a particular crew." This includes not only their agreement of February 9, 1968, but also an agreement entered into on November 26, 1968, and on October 27, 1969, after the Supreme Court's decision on the constitutionality of the full crew laws.
 It is our conclusion that this Agreement was intended to modify the National Diesel Agreement, and that it controls the obligation of the Northern Pacific with respect to the use of firemen in Washington and Oregon, as well as elsewhere, after its effective date. Of course the carrier remains liable under our opinion for any violations prior to the effective date of its agreement.