**FOOD STORE EMPLOYEES UNION, LOCAL NO. 347 AMALGAMATED MEAT CUTTERS**

and

**Butcher Workmen of North America, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 71–1550.

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1972.

Decided March 21, 1973.

As Amended April 3, 1973.

Rehearing Denied May 18, 1973.

Mozart G. Ratner, Washington, D. C., and Judith A. Lonnquist, Chicago, Ill., with whom Albert Gore, Chicago, Ill., was on the brief, for petitioner.

Robert E. Williams, Atty., N. L. R. B., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Marcel Mallet-Prevost, Asst. Gen. Counsel, and Steven R. Semler, Atty., N. L. R. B., were on the brief, for respondent.

Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

McGOWAN, Circuit Judge:

In this direct review proceeding under the National Labor Relations Act, we are concerned only with remedies. The wrongs—consisting of Section 8(a)(1) and (5) violations—were before us in Food Stores Employees Union, Local 347 v. NLRB, 139 U.S.App.D.C. 383, 433 F. 2d 541 (1970). We there granted enforcement of the Board's order, but, in response to the Union's contention that the Board should have gone further in providing adequate relief, we remanded the case to the Board for reconsideration of the Union's requests in this regard. Although the Board has increased somewhat the range of the relief granted by it initially, the Union has renewed its complaint to this court that the Board has fallen short of proper effectuation of the policies of the Act. To the limited extent hereinafter indicated, we find this to be true; and we enlarge the remedies accordingly.

I

The employing company, Heck's Incorporated, is not a stranger to the processes of the Board. Operating a chain of discount stores in the Southeast, this is the eleventh time that its resistance of union organization has embroiled it in Board proceedings.[1] In none has it prevailed at the Board level, and its fortunes in the Courts of Appeals have been only marginally better.[2] In its

1. The long history of this struggle is as follows: Heck's Discount Store, 150 NLRB 1565 (1965), enforced per curiam, 369 F.2d 370 (6th Cir. 1966); Heck's Inc., 156 NLRB 760 (1966), enforced as modified, 386 F.2d 317 (4th Cir. 1968); Heck's Inc., 158 NLRB 121, enforced per curiam, 387 F.2d 65 (4th Cir. 1967); Heck's Inc., 159 NLRB 1151 and 159 NLRB 1331 (1966), consent decree entered (4th Cir. No. 11,390 June 13, 1967); Heck's Inc., 166 NLRB 186 and 166 NLRB 674 (1967), enforced as modified, 390 F.2d 655 (4th Cir. 1968) and 398 F.2d 337 (4th Cir. 1968), modified and remanded sub nom. NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Heck's Inc., 170 NLRB 178 (1968), enforced in part, re- manded in part in light of NLRB v. Gissel Packing Co., supra, 135 U.S.App. D.C. 341, 418 F.2d 1177 (1969); Heck's Inc., 171 NLRB 777 (1969); Heck's Inc., 172 NLRB No. 255 (1969), enforced in part, remanded in part, 139 U.S.App. D.C. 383, 433 F.2d 541 (1970); Heck's Inc., 174 NLRB 951 (1971).

2. The Fourth Circuit refused to enforce an 8(a)(5) order to bargain in NLRB v. Heck's Inc., 386 F.2d 317 (4th Cir. 1967), on the ground that the card majority had been obtained through improper participation of supervisory personnel. In N.L. R.B. v. Heck's Inc., 398 F.2d 337 (4th Cir. 1968), the court declined enforcement of an order to bargain, but that decision was reversed by the Supreme Court sub

first opinion in this case, the Board characterized Heck's as having "a labor policy in all of its stores that is opposed to the policies of the Act." In its Supplemental Decision following upon our remand, the Board asserts that "it is by now clear that [Heck's] conduct here is but part of a pattern of unlawful anti-union conduct engaged in by [Heck's] top officials throughout [its] entire operations for the purpose of denying to all of its employees the exercise of those rights guaranteed the employees by Section 7 of the Act;" and, viewing Heck's conduct not "in isolation" but "in the total context," the Board characterized Heck's unfair labor practices as "clearly aggravated and pervasive."

The unfair labor practices involved in this case grew out of the Union's effort to organize the employees of Heck's store in Clarksburg, West Virginia. The 8(a)(1) violation was found by the Board to reside in unlawful questioning and threatening of employees, and management polling by nonsecret ballot to ascertain the degree of employee support for the Union. The 8(a)(5) dereliction consisted of a refusal to bargain despite the existence of cards showing a majority in favor of the Union. The remedies initially afforded by the Board included a bargaining order, and the conventional command that the employer cease and desist from interfering with Section 7 rights. Appropriate notices of the relief given were directed to be posted at all of Heck's stores.

The Union's requests for additional relief at issue on the remand were as follows:

1. A copy of the notices ordered to be posted should also be sent to the home of each Heck's employee, and the president and vice-president of Heck's should be required to read the notices to employees at all Heck's locations.

2. To facilitate Union access to employees, Heck's should (a) provide the union with a list of names and addresses of all its employees; (b) afford the Union access to company bulletin boards and other posting places; (c) permit Union use of employer facilities in non-working parts of the stores during non-working hours; and (d) permit the Union to call a meeting in each store on company time in facilities customarily used for employee meetings.

3. Heck's should be ordered to bargain with the Union on a company-wide basis, i. e., the Board should recognize a bargaining unit encompassing all the stores in the Heck's chain.

4. The General Counsel should be ordered to seek injunctions under § 10(j) of the Act whenever a complaint issues against Heck's.[3]

5. Heck's should be ordered to reimburse employees for the loss of wages and fringe benefits that would have obtained if it had not flagrantly violated § 8(a)(5) by refusing to bargain about a contract.

nom. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). This court, while enforcing the Board's order in part in Food Store Emp. U., Loc. 347, Amal. Meat Cut. v. NLRB, 135 U.S.App.D.C. 341, 418 F.2d 1177 (1969), remanded, in light of *Gissel*, for further findings as to whether the employer's refusal to bargain was accompanied by independent unfair labor practices which precluded a fair election.

3. In its Supplemental Decision, the Board at the outset noted that the Union requested this particular relief and the General Counsel opposed it, and thereafter

made no further reference to the matter. Similarly, there was no discussion of this item by either the Union or the Board in their briefs and arguments before us. In these circumstances we do not pursue the matter, except to remark that the General Counsel's statement on remand emphasizes his continuing sensitivity to the obligations imposed upon him by Section 10(j). He also pointed out that the final order to be entered by the Board in this case runs against Heck's, and cannot operate to impose obligations on the General Counsel. It may be that the matter was not pressed upon the Board in the light of these representations.

6. Heck's should be ordered (a) to pay the Union the amount of dues and fees which would have been paid by the employees of the Clarksburg store during the period of Heck's refusal to bargain; and (b) to compensate the Union for its litigation expenses, including reasonable attorney's fees, and for excess organization expenses caused by the unfair labor practices to which it was subjected.

The proceedings upon remand consisted of the receipt by the Board of statements of position from the General Counsel, the Union, and Heck's. After consideration of these statements, the Board issued a Supplemental Decision and Amended Order, which enlarged the remedies in the following respects:

1. The notices required to be posted at all of Heck's stores are also required to be mailed to each employee at his home.

2. The Union is to be afforded access for a one-year period to Heck's bulletin boards, and other places where notices to employees are customarily posted, for the posting of Union notices, bulletins, and other organizational literature.

3. The Union is to be furnished by Heck's with a list of all of its employees' names and addresses, such list to be kept current for a one-year period.

Dissatisfied with the degree to which the Board thus moved in the direction of meeting its requests, the Union petitioned for review in this court. The Board has responded in defense of its actions, but Heck's, although its position on remand was that no additional relief was in order, has not intervened and is not now before us.

II

We turn first to the controversies that remain with respect to nonmonetary relief. All of the additional relief given on remand was of that character, and it is now unchallenged. The Union does not appear to press its contention that the notices—now required to be mailed as well as posted—also be read by the company officers; and we do not, in any event, disturb this exercise of the Board's discretion. The union does complain of the failure to give it access to the employees on company property. The Board was of the view that this privilege was not demonstrably necessary to the effectiveness of the Union's organizing efforts, especially in the train of the Board's action in requiring that the Union be furnished with the list of employees' names and addresses. Until this latter expedient had been tried and found wanting, the Board thought that the problems inevitably attendant upon Union activity on company property need not be anticipated. This is an exercise of judgment which we are not disposed to overturn.

The Union also persists in its assertion that the bargaining order, which presently embraces only the unit at the Clarksburg location, should be made company-wide. The Board, emphasizing that the Union's organizing campaign has been, as in the case of Clarksburg, conducted on a store-by-store basis, and that there is no claim that the Union represents a majority of all the employees or a majority in any location other than those presently covered by bargaining orders,[4] alludes to the novelty of this kind of relief, especially in the light of Section 7's explicit guarantee of the right of employees to

---

4. Neither do we disturb the Board's rejection of a related Union proposal, which was supported by the General Counsel, that the Board enter *now* a bargaining order with respect to any single-store unit as to which the Union *hereafter* secures a card majority or otherwise achieves bargaining rights. The Board, in addition to believing that this was not essential to the employees' ability in the future freely to choose their bargaining representatives, pointed out that disputes over representation issues would, under this approach, presumably have to be decided by the courts of appeals acting with the aid of special masters—a circumstance that

refrain from representational bargaining.

■ Despite the unrelieved history of the omission of this device from the Board's remedial arsenal, the Board has purported to consider the proposal on its merits. Its conclusion was that the Union's very success in gaining majorities in a number of single locations indicates that its potential for successful organization elsewhere is substantial—a potential which, indeed, has been presumably increased by the enlarged relief currently being given. Under these circumstances, the Board thought it both unnecessary and unwise to risk trenching upon the policies of Section 7 in the absence of proof that the Union would be helpless without this extraordinary relief. These considerations seem to us rational in nature and well within the range of respect traditionally to be accorded by us to the Board's determinations.[5]

### III

The remaining components of the Union's prayer for additional relief involve monetary compensation. They are four in number.

1. *Legal Fees and Litigation Expenses.*

It is the Union's submission that, where it is necessary to exhaust legal procedures in order to attain rights accorded it by the Act, it should be reimbursed for its counsel fees and other litigation expenses, at least in respect of an employer who, like Heck's, has been found by the Board to have engaged in a deliberate "pattern of unlawful anti-union conduct." The Board, however, stressed the fact that the Act assigns the laboring oar to the General Counsel in the prosecution of an unfair labor practice charge, and that the participation of the charging party is not central to the public purposes of the statute but, rather, incidental to that party's efforts to assure protection of its own private interests. With this statutory framework, said the Board, "the public interest in allowing the Charging Party to recover the costs of its participation in this litigation does not override the general and well-established principle that litigation expenses are ordinarily not recoverable."

There are, it seems to us, obvious difficulties with this approach, certainly in the case of an employer who appears to look upon litigation as a convenient means of delaying—and thereby perhaps avoiding—the fatal day of union recognition and collective bargaining. We need not pursue those difficulties in detail, however, for the reason that the Board itself has subsequently departed from the rationale upon which its refusal of litigation expenses in this case is based. In its Supplemental Decision and Order, 194 NLRB No. 198, issued after remand by this court in International Union of Electrical, Radio & Machine Workers, AFL–CIO v. NLRB (Tiidee Products, Inc.), 138 U.S.App.D.C. 249, 426 F.2d 1243 (1970), cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970), the Board ordered the additional relief of payment to both the labor organization and the Board of their litigation expenses in both the Board and court proceedings.

In doing so the Board reasoned that the Congressional objective of achieving industrial peace through collective bargaining "can only be effectuated when speedy access to uncrowded Board and court dockets is available." It went on to conclude that, "in order to discourage

---

promises neither greater expedition in handling nor more expert resolution in result. We have no warrant to fault the Board for taking these considerations into decisive account.

5. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d

547 (1969); Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); International Union of Electrical, etc., Workers v. N.L.R.B., 138 U.S.App.D.C. 249, 426 F.2d 1243, 1250 (1970), cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L. Ed.2d 256.

future frivolous litigation, to effectuate the policies of the Act, and to serve the public interest we find that it would be just and proper" to order reimbursement of both the Board and the Union for their expenses incurred in the investigation, preparation, presentation, and conduct of the cases before it and in this court.[6]

■ We think the considerations which motivated the Board to give this enlarged relief in *Tiidee* are also operative here. Although the Board in its Supplemental Decision in this case has nowhere characterized the litigation as frivolous, it has used the language of "clearly aggravated and pervasive" misconduct; and in its original opinion it questioned Heck's good faith because of its "flagrant repetition of conduct previously found unlawful" at other Heck's stores. It would appear that the Board has now recognized that employers who follow a pattern of resisting union organization, and who to that end unduly burden the processes of the Board and the courts, should be obliged, at the very least, to respond in terms of making good the legal expenses to which they have put the charging parties and the Board. We hold that the case before us is an appropriate one for according such relief.

## 2. *Organizing Costs.*

In its Supplemental Decision after remand, the Board lumped litigation expenses and excess organizational costs together in its discussion. It prefaced that discussion by saying that " . . . we are not unmindful of the probability that the Charging Party has spent more money on organizational costs and attorneys' fees than it would have spent had

[Heck's] not refused to bargain." [7] It concluded, however, not to make any allowances in this regard for the reasons articulated by it in denying litigation expenses. This rationale, as we have seen, generally turned upon what the Board considered to be the subordinate role of a charging party in the scheme of the Act.

As in the case of litigation expenses, the Board, upon remand in *Tiidee,* has shifted its ground with respect to organizational costs. In its Supplemental Decision in *Tiidee,* the Board did not allow the claim for excess organizational expenses, but it justified that action solely on the ground that " . . . the Union was selected by the employees after a 2-month campaign at the first election held;" and, because of this circumstance, the Board found " . . . no nexus between Respondent's unlawful conduct here under examination and the Union's preelection organizational expenses . . . " Thus, in *Tiidee* the Board appears to have denied organizational costs because it believed that, on the facts of that case, no unusual organizational costs had been incurred.

■ This obviously is quite a different thing from saying that the policies of the Act forbid the allowance of such costs in cases like the one before us, where the Board has in terms indicated its awareness of "the probability" that such costs were experienced by reason of Heck's intransigence. Under these circumstances we find nothing in the Board's Supplemental Decision which constitutes an adequate justification for the denial of extraordinary organizational costs to which the Union was exposed by reason of Heck's policy of resisting organizational efforts and refusing to

6. These reimbursable expenses were described by the Board as "reasonable counsel fees, salaries, witness fees, transcript and record costs, printing costs, travel expenses and per diem, and other reasonable costs and expenses."

7. In his statement of position on remand, the General Counsel supported the Un-

ion's entitlement to extraordinary organizational costs. His comment was that where the Union was required by Heck's unfair labor practices "to expend additional funds in organizational activity over and above those normally required . . . [Heck's] should be ordered to reimburse the Union for these additional expenditures."

bargain; and we think that provision for such costs should have been included in the remedies fashioned by the Board on remand.[8]

### 3. *Union Dues and Fees.*

In its Supplemental Decision dealing with the Union's claim that it should be reimbursed for union dues and fees lost by it during the period when Heck's was refusing to bargain, the Board asserts that the only predicate for such relief would be a finding by it that, had there been bargaining, it would have resulted in the inclusion of a union security clause which would have required payment of dues and fees as a condition of continued employment. The Board concludes that "[W]hile the execution of such an agreement is of course a possibility, we cannot conclude that it is so strong a probability that any loss of dues or fees must be deemed to have resulted from [Heck's] unlawful refusal to bargain."[9]

The Union, in challenging this conclusion, argues alternatively that (1) the likelihood of the successful negotiation of a union security clause is substantial in the light of the prevalence of such clauses in collective bargaining agreements, or (2) even if it be assumed that no such contract would have ensued, the willingness of Heck's to bargain at all would have resulted in the voluntary payment of union fees and dues by at least some of the 26 employees who signed the authorization cards.

We have difficulty with each of these hypotheses. It is undoubtedly true that union security clauses have attained a wide degree of use, but it also remains true that an employer may bargain to impasse with respect to such a demand, and that the Board may not impose that obligation upon the employer. H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S. Ct. 821, 25 L.Ed.2d 146 (1970). We also think it speculative in the extreme to suppose that employees would voluntarily begin paying initiation fees and dues to a union which has been denied recognition and failed to produce a contract. There is nothing in the record to show —and the Union does not represent to us—that it made any effort to assess dues and fees during the period of its travail with Heck's. In the absence of such evidence, there is some reason to suppose that union policy, generally and in the case of the Union here involved, is not to make any effort to collect dues and fees, at least in the case of newly organized employees, until the fruits of union membership are brought home in the form of a signed agreement.[10]

---

8. Counsel for the Board in their brief in this court attempt to supply a number of reasons why excess organizational costs should not be taken into account, such as their assertedly speculative nature and their invitation of collateral litigation which burdens the Board's administration of the Act. These are counsel's reasons, not the Board's; and, under familiar principles of judicial review of administrative agencies, we appraise the Board's actions only in terms of the latter.

9. The Board raised, although it pretermitted, a question as to its power to provide a remedy in respect of union dues and fees, because of the restrictions on payments by employers to employee representatives imposed by Section 302 of the Act. Because of the disposition we make of this claim we need not pursue this issue of authority, although it would appear that Section 302 is addressed to other circumstances than those involved here.

10. In its rejection of a claim of this kind on remand in *Tiidee*, the Board noted that the labor organization involved in that case had asserted that " . . . because it is union policy not to collect initiation fees and dues until a contract is executed, it has received nothing from the unit employees throughout the course of this proceeding . . . " The Board purported first to view this claim as "partaking of a request for a make-whole remedy, which we have declined to order, since presumably the dues and fees sought would have come from lost wages . . . " Although it may be that the Board here is confusing the substantive merits of a make-whole remedy with the wholly manageable problem of preventing a double recovery, the Board went on to conclude that, since the union as a matter of policy did not seek initiation fees and dues prior to negotiation of a contract, it saw no reason to cause the employer to assume the risk of that passivity.

It would, in any event, present formidable problems of proof to try to determine at this late date which employees would, if they had been asked, have paid fees and dues during the period in question. Short of assuming that all would have done so—an assumption for which there seems little foundation in the realities of human nature—the inquiry would be an exercise in futility. In any event, the loss, if any, of such dues and fees will, we think, be offset to some extent by the relief we have directed in respect of extraordinary organizational costs.[10a]

### 4. Compensation for Lost Benefits.

The additional remedy of making its members whole for the wage and other fringe benefits which might have accrued from the bargaining process is the matter principally pressed by the Union. In its Supplemental Decision, the Board initially reiterated its position, stated in Ex-Cell-O Corporation, 185 NLRB No. 20, that it was wholly lacking in statutory authority to give relief of this nature. However, it went on to conclude that, even if it had the power to act, this would not be an appropriate case in which to do so. It pointed to the opinions of this court subsequent to Tiidee, in which we have held the make-whole remedy inapplicable where the refusals to bargain rested on "debatable" issues, as contrasted with those which we, as in Tiidee, have characterized as "patently frivolous."[11] Referring to the precise circumstances of this case, the Board concluded that the latter category did not embrace a defense which failed solely by reason of the credibility determinations of the Trial Examiner.

The union, although harassed from the beginning of its organizing campaign at the Clarksburg store, within a few days represented to Heck's that it had in hand the signed authorization cards of a majority of the employees; and it requested recognition and bargaining. The response of Heck's was to file a petition for an election. When the election was held some six weeks later, the Union lost by a vote of 16 to 19, although this result was subsequently nullified by reason of the employer's unfair labor practices. The Trial Examiner found that the General Counsel had failed to prove that Heck's lacked a good faith doubt of the Union's majority status and that, accordingly, there was no 8(a)(5) violation.

10a. In Bangor & Aroostock R. Co. v. BLFE, 143 U.S.App.D.C. 90, 442 F.2d 812 (1971), this court held that dues and fees could be recovered by a union as damages in respect of improper job abolitions. A union shop clause in the collective bargaining agreement there involved made it plain that, but for the employer's action, dues and fees would have been paid. The uncertainty claimed was whether men hired to fill the positions would have joined the plaintiff union rather than its competitor. The court there thought that the evidence supported a reasonable inference that they would, thereby justifying the placing of the burden of proof as to the uncertainty on the employer. In the case before us, union policy would have resulted in no receipt of dues and fees even during an unduly prolonged bargaining period.

11. International Union, UAW v. NLRB (Ex-Cell-O Corporation) 145 U.S.App. D.C. 384, 449 F.2d 1046; Id., 145 U.S. App.D.C. 396, 449 F.2d 1058 (1971); Steelworkers v. NLRB (Quality Rubber Mfg. Co.), 139 U.S.App.D.C. 146, 430 F.2d 519 (1970); Amalgamated Clothing Workers v. NLRB (Levi Strauss & Co.), 142 U.S.App.D.C. 337, 441 F.2d 1027 (1970).

In Ex-Cell-O, the union requested and won the election, but the employer refused recognition on the basis of union activity which allegedly precluded a fair election. In Quality Rubber, the employer refused recognition on the basis of cards, but did not seek an election. The result turned on issues of credibility which, although resolved against the employer, were found to be consistent with good faith. In Levi Strauss & Co., the union requested an election after the employer refused recognition on the basis of cards. The union lost, but the employer was ordered to bargain because it was found to have engaged in unfair labor practices during the period preceding the election. Again the resolution turned on conflicting testimony.

In making this determination, the Trial Examiner focused first on the substance of Heck's refusal to recognize the Union on the basis of the cards. The administrative hearing record shows that Heck's introduced testimony by certain employees as to intimidation and other circumstances which, if it had been believed, would have eliminated enough cards to vitiate the majority status claimed by the Union. Although the Trial Examiner ultimately found each of the cards to have been validly obtained, he noted that the determination turned upon some close questions concerning the credibility of witnesses. The Trial Examiner also emphasized the fact that Heck's had promptly filed an election petition after the demand was made, and that Heck's had had some prior experience with card-based bargaining demands from the Union which later proved unwarranted.[12]

The Board took its stand principally upon what it termed to be the long history of disregard by Heck's generally of its obligations under the Act. Thus the Board's finding of bad faith was based not on a determination that Heck's objections to this particular demand for recognition were insubstantial, but rather on Heck's repetition in the period preceding the election of conduct found in prior proceedings to have been illegal. We agree with the Board's conclusion that an employer's good faith must be judged in the entire context of its behavior, and indeed our determination that some additional remedies are required in this case is based on Heck's consistent and repeated demonstration of antiunion animus. However, the factors which influenced the Trial Examiner on the issue of good faith remain undisturbed by the Board's decision and are relevant to the appropriateness of the make-whole remedy.

■ In the light of these circumstances, we are not inclined to say that the Board's treatment of this issue on remand is beyond the wide range of latitude traditionally accorded the Board in the matter of remedies. The Supreme Court, although ultimately accepting the signed card approach in *Gissel* as a basis for creating the recognition and bargaining obligation, did at the same time refer to cards as "admittedly inferior to the election process." The employer here appears to have had some basis for questioning the result of the card approach, and it exhibited its readiness to invoke the election process. We do not, accordingly, revise the Board's failure to provide an additional remedy in the form of a make-whole provision.[13]

We grant enforcement of the Board's Amended Order, as the same shall be further enlarged upon remand by the inclusion of the additional remedies of litigation costs and organizational expenses discussed hereinabove.

It is so ordered.

---

12. Heck's Inc., 159 NLRB 1151, 159 NLRB 1331, consent decree entered (No. 11,390, 4th Cir. June 13, 1967) ; N.L.R.B. v. Heck's Inc., 386 F.2d 317 (4th Cir. 1968).

13. The Board is equipped with a broad arsenal of remedies which it may employ in the case of a persistent violator. Rather than require application of such remedies on an all-or-nothing basis, it seems to us preferable to preserve sufficient flexibility to adjust the relief granted to the particular facts of each case. There are, as in everything else, degrees of flagrancy—and variations in its pattern.