502 F.2d 349
 86 L.R.R.M. (BNA) 2093, 87 L.R.R.M. (BNA) 2255,
163 U.S.App.D.C. 347, 73 Lab.Cas. P 14,482,
74 Lab.Cas. P 10,280
 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE
WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Tiidee Products,
Inc., Intervenor(two cases).
TIIDEE PRODUCTS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, International
Union of Electrical, Radio and Machine Workers,
AFL-CIO, Intervenor (two cases).
 Nos. 72-1080, 72-1365, 72-1691, 72-1692.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Sept. 24, 1973.
April 25, 1974
Certiorari Denied May 28, 1974
Rehearing and Rehearing En Banc Denied Aug. 29, 1974.
See 94 S.Ct. 2629
 
 Ruth Weyand, Washington D.C., with whom Winn Newman and Melvin Warshaw, Washington, D.C., were on the brief, for petitioner in Nos. 72-1080 and 72-1365 and Intervenor in Nos. 72-1691 and 72-1692.
 Lawrence M. Cohen, Chicago, Ill., with whom Roy E. Browne, Akron, Ohio, was on the brief, for petitioner in Nos. 72-1691 and 72-1692 and Intervenor in Nos. 72-1080 and 72-1365. Alan Raywid, Washington, D.C., also entered an appearance for Tiidee Products, Inc.
 William H. DuRoss, III, Atty. National Labor Relations Board, with whom Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., National Labor Relations Board, were on the brief, for respondent.
 Before TAMM, MacKINNON and ROBB, Circuit Judges.
 MacKINNON, Circuit Judge:
 
 
 1
 In these consolidated cases we are called upon to review[1] supplemental decisions and amended orders of the National Labor Relations Board (the Board) entered pursuant to our remands in Tiidee I[2] and Tiidee II.[3] The facts of these cases are fully stated in the prior Board[4] and court decisions. The remands in Tiidee I and II were based upon the contention of the International Union of Electrical, Radio and Machine Workers, AFL-CIO (the Union) that extraordinary affirmative relief was required to undo the effects of what the court termed Tiidee Products, Inc.'s (the Company) flagrant refusals to bargain, and its subsequently frivolous litigation.[5] The Board's orders here under review provide certain additional relief requested by the Union, but do not go as far as the Union would have them. As modified by this opinion, the Board's orders will be enforced.
 
 
 2
 * In Tiidee I this court held that the Company violated section 8(a)(5) of the National Labor Relations Act (the Act), 29 U.S.C. 158(a)(5) (1970), by what the majority opinion variously characterized as a 'brazen refusal to bargain,' a 'manifestly unjustifiable refusal to bargain' and a 'clear and flagrant violation of the law.'[6] It then attempted to defend its action before the trial examiner and the Board[7] on the basis of what the Tiidee I court found to be a violation of the express terms of the Agreement for Consent Election and 'patently frivolous'[8] objections to the election by which the Union had obtained certification as the exclusive bargaining representative of the unit employees.
 
 
 3
 The relief ordered in the original Board proceedings in light of the section 8(a)(5) and other unfair labor practices included a broad cease and desist order, and required the Company to post appropriate notices, bargain collectively with the Union upon request, furnish the Union with certain requested information on current wages and fringe benefits, and reinstate with back pay employees laid off and discharged because of their union activities. These conventional remedies were found by the Tiidee I court to be an inadequate means of insuring meaningful bargaining and to reward[9] unjustly the Company for its illegal actions during the delay of litigation and enforcement of the Board's orders. The case was thus remanded to the Board for further consideration of the Union's make-whole claim and other additional or alternative forms of relief. Tiidee II involved further section 8(a)(5) violations, as well as other unfair labor practices, and again the case was remanded for further consideration of more appropriate remedies in light of the Tiidee I decision.
 
 
 4
 In the supplemental decisions and orders here under review, entered under the compulsion of our prior decisions, the Board finally ordered some additional affirmative remedies for the section 8(a)(5) violations in both Tiidee I and II but again declined to order any broad make-whole relief. The Board thus denied payment to employees for the difference between wages and benefits actually received and what the Union contended they would have received had the Company bargained in good faith to agreement on a contract with the Union. Similarly, the Board denied the Union's request that it be reimbursed for allegedly 'lost' dues and fees, and organizational expenses. The Board did, however, order the Company to reimburse the Board and the Union for all litigation expenses, including attorney fees, in connection with the section 8(a)(5) issues in both Tiidee I and II.[10]
 
 
 5
 Additionally, the Company was ordered to mail copies of the Board's posted notices to the home of each employee in the bargaining unit, permit Union access to the Company's bulletin boards and other places where notices to employees are posted so it could post Union notices and other literature during the ensuing period of contract negotiations, and furnish the Union with a list of names and addresses of its employees and keep the list current for a period of one year. As to these latter affirmative actions required of the Company, we fully agree with the Board's finding that they are necessary and appropriate to guarantee that rights conferred by section 7 will not be denied.[11]
 
 II
 
 6
 In the supplemental proceedings in both Tiidee I and II, the Board ordered the Company to 'pay to the Board and the Union the costs and expenses incurred by them in the investigation, preparation, presentation, and conduct of these cases before the National Labor Relations Board and the courts . . ..'[12] Apparently the Board ordered this remedy in response to the Tiidee I court's suggestion that
 
 
 7
 the scope of the Board's consideration on remand, if it is deemed that the Union's proposal goes too far, would include consideration of such lesser, alternative remedies as an award to the Union . . . for the costs of having to litigate a frivolous case . . ..[13]
 
 
 8
 The Company vigorously contests the power of the NLRB to order the award of attorney fees and other litigation expenses to the Board and the Union, but that issue was recently settled in this circuit in Food Store Employees Union, Local No. 347 Amalgamated meat Cutters v. NLRB, 155 U.S.App.D.C. 101, 476 F.2d 546, cert. granted, 414 U.S. 1062, 94 S.Ct. 567, 38 L.Ed.2d 467 (1973), which held that the Board does have the power in appropriate cases to order such a remedy.*13 Thus Food Store in large measure controls our disposition of that issue in this case.
 
 
 9
 Food Store involved "clearly aggravated and pervasive' misconduct (by the employer, and the Board) questioned (the employer's) good faith because of its 'flagrant repetition of conduct previously found unlawful' at other (of its) stores.'[14] The premise for sustaining the award of litigation expenses in Food Store was that
 
 
 10
 employers who follow a pattern of resisting union organization, and who to that end unduly burden the processes of the Board and the courts, should be obliged, at the very least, to respond in terms of making good the legal expenses to which they have put the charging parties and the Board.[15]
 
 
 11
 As stated above we do not write today on a clean slate but are bound as to the law by Food Store. That being so, we are led inexorably to the conclusion that if the facts of Food Store presented an appropriate case for the award of attorney fees, then, a fortiori, the instant case does also.[16] The element of frivolous litigation, as the Tiidee I court decided exists in this case, presents a different and even stronger situation for awarding litigation expenses if the payment of attorney fees can be ordered paid for flagrant repetition of conduct violative of the National Labor Relations Act. The court's finding in Tiidee I that, on the facts presented, the Company had engaged in frivolous litigation constitutes the law of this case.**6 The court's articulation of that finding is a harsh litany: the Company's conduct 'was a clear and flagrant violation of the law'; /17/ 'its objections to the election were patently frivolous'; /18/ the Company's action was 'a brazen refusal to bargain, in violation of solemn obligations'; /19/ its position was 'palpably without merit'; /20/ and the case involved 'a manifestly unjustifiable refusal to bargain.' / 21/ In light of the precedent established by Food Store and of the court's decision in Tiidee I as to the law and the facts, stare decisis and the law of the case leave us no recourse but to enforce at least in part the Board's award to the Union of attorney fees and litigation expenses.
 
 III
 
 12
 Difficulties remain, however, as to the manner in which the Food Store and Tiidee decisions may be accommodated with our view of the Board's or ders in this case. Two significant issues, therefore, must be confronted. First, whether the Board itself should be reimbursed for its expenditures in litigating this case, and second, whether legal expenses during the full course of this litigation should be allowed. We answer both in the negative.
 
 A. Reimbursement to the Board
 
 13
 Any remedy ordered by the Board under section 10(c) must satisfy the ultimate standard that it is designed both in intent and operation to effectuate the policies of the National Labor Relations Act. Three rationalizations may be advanced to support the proposition that the imposition of attorney fees and other legal expenses in cases of frivolous litigation effectuates the policies of the Act: (1) the policies underlying the traditional American rule against awarding attorney fees are unpersuasive in such cases;[22] (2) the remedy would effectively prevent the diversion of administrative resources from meritorious cases;[23] and (3) the award of such costs might help restore the Union to the status quo ante.[24]
 
 
 14
 In Food Store, the court enlarged the Board's order to include the award of litigation expenses to the Board as well as the union. The court found it unnecessary on the facts and legal theory there involved to consider explicitly whether an award of legal expenses to the Board involved considerations distinct from granting such reimbursement to a union. The significantly distinguishing feature of Food Store was the employer's comprehensive pattern of illegal resistance to any form of unionism. The court succinctly summarized the employer's predilection for unlawful conduct:
 
 
 15
 The employing company . . . is not a stranger to the processes of the Board. Operating a chain of discount stores in the Southeast, this is the eleventh time that its resistence of union organization has embroiled it in Board proceedings. In none has it prevailed at the Board level, and its fortunes in the Courts of Appeals have been only marginally better.[25]
 
 
 16
 The Food Store court thus held that an employer who egregiously continues to violate the Act must reimburse both the Board and the union for their legal expenses.
 
 
 17
 By contrast, in the instant case we are confronted with an employer who actually is a 'stranger to the processes of the Board,' however wilful his violation and frivolous his defenses. Confronting this situation, the Tiidee I court demonstrably was concerned principally with assuring adequate remedial relief to the Union rather than to the Board. The entire thrust of the Tiidee I decision, as evidenced by the discussion on make-whole relief, focused on remedying the harm suffered by the Union because of the Company's conduct. Indeed, in suggesting the alternative relief of reimbursement of litigation expenses, the Tiidee I court specifically contemplated that only the Union would receive such an award.[26] Moreover, although reimbursement to the Board arguably might be consistent with the incidental rationale in Tiidee I of preventing the diversion of administrative resources from meritorious cases, any such advancement of that policy would only be cumulative to that produced by reimbursement to the Union. Thus, while Food Store established the power of the Board to award legal expenses to itself,*** the present case does not present an appropriate situation for its exercise. Accordingly, the orders here under review shall be modified by deletion of any re quirement of payment by the Company to the Board for attorney fees and other legal expenses.
 
 
 18
 B. Limitation on Reimbursement to the Union
 
 
 19
 The Company also contends that litigation expenses should not be allowed beyond the date of the Board's initial Tiidee I decision because as of that date it assertedly was ready and willing to bargain in good faith and the litigation subsequent to that date was related only to the determination of remedies appropriate to already conceded section 28(a)(5) violations.[27] We find this argument persuasive. We sustain in principle the award of litigation expenses in this case because the Tiidee I court found that the Company raised frivolous defenses before the Board. All litigation subsequent to that date, however, certainly did not involve frivolous litigation by the Company-- indeed, the opposite is true. After the Board's decision in Tiidee I, the Company only sought to sustain the Board's position that traditional relief was adequate, and to resist an attempt by the Union to have the Board impose the exceptionally novel remedy of make-whole relief, a remedy that has never been ordered in the 39-year history of the Act.[28] The Board agreed with the Company at the outset of this litigation, before this court in Tiidee I indicated that such relief might be possible. Moreover, the Board continues to hold firmly the belief that it is without the power under section 10(c) to award the make-whole relief demanded by the Union.[29]
 
 
 20
 It is arguable, of course, that the section 8(a)(5) violations and the ensuing frivolous litigation before the Board cannot realistically be separated from attempts by the Union legally to cure the harm that they caused. Moreover, the limitation we delineate today might permit an employer to decimate a union, or vice versa, and escape imposition of remedial orders that comprehend the totality of his actions simply by vowing a change of heart. Thus we do not rely on the Company's assertion that after the Board's Tiidee I decision it was ready and willing to bargain. Nevertheless, we recognize that these protracted proceedings clearly constitute what is, in effect, a test case by the Union to establish the viability of a new concept of make-whole relief that amounts to an unprecedented remedy. We therefore think the Company should not, because of its misconduct at the start of the case, be forced fully to subsidize the Union's legal efforts in such a case.
 
 
 21
 In the Tiidee II supplemental decision the Board examined the Company's conduct 'in the total context of (its) entire course of unfair labor practices' and found that, in view of its finding 'in Tiidee I that frivolous issues were raised and litigated to postpone or avoid a lawful obligation to bargain, (the Company's) conduct in the instant case is so inextricably intertwined with (its) refusal on frivolous grounds to bargain with the Union as to require the conclusion that it was part of the same pattern of patently frivolous litigation for the same unlawful object . . ..'[30] Although we believe that the Company's legal position in Tiidee II cannot fairly be characterized as frivolous, there is ample support in the record for the finding that its conduct in Tiidee II was also designed to 'postpone or avoid a lawful obligation to bargain' so that an award of litigation expenses properly is sustainable under Food Store, supra. As noted above, however, the award must be limited to expenses incurred in litigating the initial case before the Board and therefore does not extend to any subsequent legal proceedings involving the question of appropriate remedies.
 
 
 22
 In summary, the orders relating to the award of attorney fees and other litigation expenses are modified to delete any requirement that the Company reimburse the Board for its legal expenses, and to limit reimbursement to the Union to expenses it incurred only for litigation before the Board in the initial Tiidee I and II decisions.
 
 IV
 
 23
 The Board refused to grant the broad make-whole remedy requested by the Union and the Union now strenuously argues that in so doing the Board failed to comply with this court's directives on remand. The Union's argument rests principally upon two grounds. First, that our decision in Tiidee I mandated a make-whole remedy, and second, that the Board improperly relied upon the difficulty of ascertaining the contract terms that would have been agreed to had the Company bargained in good faith. The first argument has little merit. The Tiidee I court quite clearly did not require imposition of a broad make-whole remedy; indeed, it indicated that the Board could select remedies other than make-whole relief if they would adequately effectuate the policies of the Act and were supported by reasoned analysis.[31]
 
 
 24
 The second contention of the Union has more substance but on full consideration it too must fail. The court in Tiidee I drew a distinction between contract terms that 'would' and 'should' have been agreed to by the parties had they bargained together in good faith to agreement. Although the Board does not have the power to impose 'should' contract terms or to grant make-whole relief where no agreement would have been reached, the Tiidee I court clearly stated that:
 
 
 25
 A tribunal given the function of implementing national policy through compensatory remedies may not soundly refer to the difficulty in quantifying appropriate compensation as a justification for withdrawal and frustration of the policy, particularly where such an approach would operate only to reward the wrongdoer and to give him an advantage over a lawabiding competitor.[32]
 
 
 26
 It is necessary, therefore, to examine and determine the sufficiency of the record evidence that would form the basis for awarding make-whole relief.
 
 
 27
 At the unfair labor practice hearing in Tiidee I, the trial examiner freely allowed the Union to introduce evidence in support of its make-whole request. And, in its Statement of Position of Charging Party on Remand,[33] the Union proffered certain evidence to establish the compensation and fringe benefits earned by employees prior to certification and what they could be expected to have received had the Company bargained in good faith. This evidence is of limited relevance, however, because it, for example, refers to bargaining units of much greater size than the Union's, lumps all manufacturing industries to gether, and generally consists of national, rather than local, statistics.[34]
 
 
 28
 The precise issue, then, is whether this evidence validly could be translated into specific contract terms that would have been agreed to by both the Union and the Company had they bargained together in good faith to an agreement. The Board specifically found that it could not 'ascertain with even approximate accuracy . . . what the parties 'would have agreed to."[35] Moreover, the Board also seemed to suggest that the parties might not have reached any agreement at all.[36] We have closely examined the record evidence and cannot conclude that the Board's finding on this issue was without substantial support in the evidence.
 
 
 29
 There is yet another basis for affirming this aspect of the Board's decision, however, for it appears that the Board permissibly balanced the difficulty in this particular case of ascertaining the contract terms that would have been agreed to against the relative ease and certainty of awarding litigation expenses to the Union and ordering other affirmative remedies. The Board found that make-whole relief was 'not practicable'[37] in this case, and that it 'would effectuate the policies of the Act to grant some but not all of the requested relief.'[38] Thus the Board found that its selection of affirmative remedies was an adequate alternative means of effectuating the Act's policies and satisfying the directives of the Tiidee I and II remands.[39] The Tiidee I court was 'particularly' concerned that reliance on 'the difficulty in quantifying appropriate compensation . . . would operate only to reward the wrongdoer'; this concern is largely vitiated by the additional remedies ordered in this case, including limited litigation expenses.[40] On these facts, given our limited scope of review, we are not disposed to overturn this finding.
 
 V
 
 30
 The Union also requested compensation from the Company for Union members' dues and fees allegedly lost to it because of the Company's flagrant refusal to bargain. The Board premised its denial of this relief on two grounds. First, it argued that such relief is part and parcel of the broad make-whole remedy denied in this case since such items would come from 'lost' wages.[41] Second, it felt that since it was the Union's policy to waive such dues and fees until after a contract had been signed, the risk of losing such monies when no contract is signed should not be shifted from the Union to the Company.[42] Food Store, supra, considered this same issue and sustained the Board's denial of such relief in that case. Food Store premised its holding, inter alia, on the fact that 'it is undoubtedly true that union security clauses have attained a wide degree of use, but it also remains true that an employer may bargain to impasse with respect to such a demand, and that the Board may not impose that obligation upon the employer. H. K. Porter Co. v. NLRB, 397 U.S. 99 (90 S.Ct. 821, 25 L.Ed.2d 146) (1970).'[43] We reaffirm that holding.
 
 
 31
 The Board also denied the Union's request for reimbursement of organizational expenses supposedly lost because of the Company's refusal to bargain. The Union argues that this remedy should be ordered because the money it spent in pre-election organization efforts was 'rendered a complete waste' due to the unlawful refusal to bargain.[44] It points out that the delay in bargaining caused loss of interest in the Union and loss of membership.[45] We agree with the Board, however,
 
 
 32
 that the Union incurred no extraordinary organizational expenses . . .. Despite certain already remedied preelection unlawful (Company) conduct, the Union was selected by the employees after a 2-month campaign at the first election held. We find, therefore, no nexus between (the Company's) unlawful conduct here under examination and the Union's preelection organizational expenses . . ..[46]
 
 
 33
 Thus the Union incurred only normal organizational expenses in its campaign for election. In Food Store, by contrast, organizational expenses were allowed because there the employer's pervasively unlawful conduct required the expenditure of extraordinary amounts of money.[47] Moreover, it should be noted that the purpose of an organizational drive such as that conducted by the Union is to gain majority status among the unit employees, win the representation election and obtain certification. A principal benefit gained by this process is certification as the exclusive bargaining agent for the unit. The Union here achieved this status and the one year protective period guaranteed by such certification will not begin to run until the Company begins to bargain in good faith with the Union.[48] The denial of organizational expenses to the Union must be affirmed since it was not forced to make extraordinary expenditures and those normal expenses it did incur were not rendered a complete waste.
 
 
 34
 As modified herein, the amended orders under review shall be enforced.
 
 
 35
 It is so ordered.
 
 
 36
 On Petitioner's Suggestion for Rehearing En Banc
 
 
 37
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 
 38
 Petitioner has filed a suggestion for rehearing en banc. On consideration thereof, it is
 
 
 39
 Ordered by the Court en banc that the suggestion for rehearing en banc is denied, a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure).
 
 
 40
 Statement of BAZELON, Chief Judge, as to why he voted to deny rehearing en banc in which WRIGHT and ROBINSON, Circuit Judges, join.
 
 
 41
 A Division of this Court has upheld the Labor Board's refusal to grant 'make-whole' relief because substantial evidence exists to support a finding that the truth of union allegations of possible contract terms could not be ascertained with 'even approximate accuracy.' Absent extraordinary circumstances, it is not the function of en banc hearings to review questions of substantial evidence and, therefore, I vote to deny en banc review. However, in doing so, I think it helpful to clearly emphasize that the Board cannot avoid the mandate of Tiidee I[49] by repeated findings that union allegations concerning possible contract terms are not supported by the evidence. The policy of the NLRA requiring good faith bargaining between management and labor is too important to be vindicated only through in futuro relief. The 'make-whole' remedy is the single effective action that can be taken to mitigate the past effects of brazen refusals to bargain.[50] I for one would not take a restrictive approach to the proof necessary to sustain this remedy.[51] This point applies also to the exercise of the Board's discretion in granting litigation expenses in lieu of 'make-whole' relief: while the Board clearly does have that discretion, I do not think it can be exercised in a manner which effectively eliminates the availability of true 'make-whole' relief.
 
 
 
 [1]
 The Union and the Company seek review of certain portions of the supplemental decisions and amended orders, while the Board has cross-applied for enforcement of its amended orders. Our jurisdiction rests upon sections 10(e) and 10(f) of the National Labor Relations Act, 29 U.S.C. 160(e), (f) (1970)
 
 
 [2]
 International Union of Electrical, Radio and Machine Workers, AFL-CIO v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970)
 
 
 [3]
 International Union of Electrical, Radio and Machine Workers, AFL-CIO v. NLRB, 142 U.S.App.D.C. 270, 440 F.2d 298 (1970)
 
 
 [4]
 Tiidee I: Tiidee Products, Inc., 174 NLRB 705 (1969); Tiidee Products, Inc. (Supp. Decision), 194 NLRB 1234 (1972). Tiidee II: Tiidee Products, Inc., 176 NLRB 969 (1969); Tiidee Products, Inc. (Supp. Decision), 196 NLRB 158 (1972)
 
 
 [5]
 These decisions are binding upon this panel and partially determine our disposition of this appeal
 
 
 [6]
 Tiidee I, supra note 2, at 255, 256, 254, 426 F.2d at 1249, 1250, 1248
 
 
 [7]
 The Company conceded the section 8(a)(5) violations on review before the Tiidee I court. It also conceded some of the section 8(a)(2) violations but resisted the findings and remedies dealing with other alleged violations. Tiidee I, supra note 2, at 252, 426 F.2d at 1246
 
 
 [8]
 Tiidee I, supra note 2, at 254, 426 F.2d at 1248
 
 
 [9]
 It is a reward only if one considers that increased benefits were certain to be obtained by the Union. Such a result, however, was uncertain and remains so to this day. Thus, it is not strictly accurate to say that the Company profited or was rewarded by the delay
 
 
 [10]
 The Board stated it was unable to allocate litigation expenses between the section 8(a)(5) and other violations in Tiidee II and thus granted reimbursement for all such expenses. Tiidee Products, Inc., 196 NLRB at 159 n. 7 (1972); Jt.App. at 127 n. 7. We think this finding is untenable and therefore the Board shall be required to determine the proper allocation of litigation expenses related to the section 8(a)(5) violations. See text following note 30 infra
 
 
 [11]
 Tiidee Products, Inc., 194 NLRB 1234, 1235-36 (1972)
 
 
 [12]
 Id. at 1237; 196 NLRB 158, 159
 
 
 [13]
 138 U.S.App.D.C. at 259 n. 15, 426 F.2d at 1253 n. 15
 13A My views on the issues in Tiidee I and II are set forth in my dissenting opinions to those decisions. In this third stage of the Tiidee proceedings, the opportunity to consider as a matter of first impression the adequacy and legal soundness of the Board's supplemental decisions and amended orders has been circumscribed by the intervening Food Store decision, decided by another panel of this court. In these circumstances, and because of my prior participation in Tiidee I and II, it is peculiarly appropriate to set forth my individual views on three basic issues. These personal views are set forth in this footnote *, and in footnotes ** and ***, infra. As to footnote **, we all recognize that we are bound by the law of the case but my prior familiarity with the record in Tiidee I and II compels me to reaffirm my individual dissent in those cases with additional detail. As to footnotes * and ***, Judges Tamm and Robb feel that debate in this circuit has been foreclosed by Food Store Employees Union, Local No. 347 Amalgamated Meat Cutters v. NLRB, 155 U.S.App.D.C. 101, 476 F.2d 546, cert. granted, 414 U.S. 1062, 94 S.Ct. 567, 38 L.Ed.2d 467 (1973). As my authorship of the opinion for the court demonstrates, I agree that Food Store is controlling; nonetheless, I feel it necessary to express my personal opinion on what I perceive as relatively clearcut and as yet not fully illuminated issues.
 It is my individual opinion that section 10(c) does not authorize the Board to award attorney fees. Traditional American jurisprudence circumscribes even the power of the courts to award attorney fees. There are, of course, several well established exceptions to the American rule prohibiting their award by the courts. Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The award of attorney fees by a statutory board in this case is predicated upon a congressional grant of authority pursuant to section 10(c) of the Act. The broad language of that section, however, does not compare favorably with the explicit, unambiguous and specific language consciously selected by Congress in other statutes. For example, the Interstate Commerce Act provides that 'if the plaintiff shall finally prevail (in court) he shall be allowed a reasonable attorney's fee, to be taxed and collected as part of the costs of the suit.' 49 U.S.C. 16(2) (1970). Similarly, the Clayton Act specifically requires that a person injured by a violation of the antitrust laws 'shall recover (in court) the cost of suit, including a reasonable attorney's fee.' 15 U.S.C. 15 (1970). Thus the unvarying rule is that when Congress intends to permit the courts to award attorney fees to the prevailing party in statutory causes of action, it does so with precision and unmistakable clarity. E.g., Packers and Stockyards Act, 1921, 309(f), 7 U.S.C. 210(f) (1970); Perishable Agricultural Commodities Act, 7(b), 7 U.S.C. 499g(b) (1970); Trust Indenture Act of 1939, 323(a), 15 U.S.C. 77www(a) (1970); Securities Act of 1933, 11(e), 15 U.S.C. 77k(e) (1970); Securities Exchange Act of 1934, 9(e), 18(a), 15 U.S.C. 78i(e), 78r(a) (1970); Copyright Act, 116, 17 U.S.C. 116 (1970); Labor-Management Relations Act (Taft-Hartley Act), 303, 29 U.S.C. 187(b) (1970) (relating to secondary boycotts) (see also Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 260 n. 16, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964)); Fair Labor Standards Act of 1938, 16(b), 29 U.S.C. 216(b) (1970); Servicemen's Readjustment Act, 1822(b), 38 U.S.C. 1822(b) (1970); Civil Rights Act of 1964, 706(k), 42 U.S.C. 2000e-5(k) (1970); Railway Labor Act, 3(p), 45 U.S.C. 153(p) (1970); Communications Act of 1934, 206, 47 U.S.C. 206 (1970).
 Absent statutory authority, courts may, in the exercise of their inherent equitable powers, award attorney fees in certain carefully circumscribed situations where 'overriding considerations indicate the need for such a recovery.' Hall v. Cole, supra, at 4-5. An administrative agency possesses no such inherent equitable power, however, for it is a creature of the statute that brought it into existence; it has no powers except those specifically conferred upon it by statute. The Board's power to award attorney fees, then, depends exclusively upon section 10(c). That section admittedly constitutes a broad grant of authority, Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), but in that very broadness, as contrasted to the statutes cited above, lies the fatal flaw to any argument that the Board has the power to order reimbursement for attorney fees and other litigation expenses. Section 10(c) grants the Board the authority to order an employer or union to 'take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of' the Act. The words 'affirmative action' are calculated more to connote that type of action ordinarily ordered by the Board in unfair labor practice cases, such as ordering the parties to engage in collective bargaining, to cease and desist from unfair labor practices, refrain from secondary boycotts, cease unlawful picketing, and so forth. Moreover, where monetary compensation is involved, the Congress thought it necessary to state explicitly that employees could be 'reinstated with or without back pay.'
 There is yet another significant weakness in the argument that section 10(c) authorizes the Board to award attorney fees. The Labor Act, especially after the 1947 amendments, was intended carefully to adjust and balance the rights and interests of labor, management and the government; the Act manifestly was designed to provide fair and even-handed treatment. The award of attorney fees pursuant to section 10(c) demonstrably does violence to these fundamental precepts, however, for no comparable remedy is available against a charging party even though in filing a charge and causing a complaint to issue he may be motivated by the same illegal reasons (a pattern of illegal resistance to unionization) and be engaged in the same conduct (frivolous litigation) on which such award is premised in Food Store and the instant case. The 'affirmative action' clause in section 10(c) applies only against the charged party. By contrast, a charging party, who is a party of right (29 C.F.R. 102.8 (1973)) permitted fully to litigate the case at the hearing (29 C.F.R. 102.38 (1973)) and before the Board, may file a charge based on totally false facts or raise totally frivolous issues for the purpose of infringing an employer's protected rights and yet, if the Board determines that the complaint based on such a charge is totally without merit, section 10(c)'s second proviso provides only that 'the Board shall state its findings of fact and shall issue an order dismissing the said complaint.' And, although it may be hoped that the regional directors or the General Counsel would weed out such charges and not issue a complaint, it is clear that such frivolous cases may occur, especially since neither the Act (section 10(b)) nor the regulations (29 C.F.R. 101.4 (1973)) requires any investigation of the charges prior to the issuance of a complaint. Thus, although perfect symmetry is not required or even expected, the fact that a charging party who engages in frivolous litigation escapes completely unscathed while his counterpart, for example the Company in this case, is liable for large litigation expenses strongly suggests that the Congress never intended the Board to possess the power to impose attorney fees and other litigation expenses.
 It is also of critical importance in construing so broad a grant of authority, one thought by Congress best to reside in 'the empiric process of administration,' Phelps-Dodge, supra, at 194, that in the entire 39-year history of the Act section 10(c) has never before been interpreted to support the exaction of attorney fees in cases such as this. This consistent administrative interpretation and practice for so many years argues persuasively against change by the Judiciary. After more than a decade of operation without such a remedy, section 10(c)'s precise language survived intact the 1947 Taft-Hartley Amendments. Moreover, in all the 39 years of legislative history surrounding section 10(c), none of it gives any support for the interpretation that Congress intended to allow the Board to award attorney fees and litigation expenses to prevailing parties. Therefore, if the complaint be made that the powers of the Board are inadequate, let it be made to the Congress and not the Judiciary-- any proper conception of, and respect for, the relative domains of each demands no less.
 It would, moreover, be unsound policy to invest the Board with the power to grant attorney fees, for theory rarely is congruent with reality. It may well be a reassuring proposition to state that attorney fees will only be awarded in frivolous or flagrant cases, but the predicates of the adversary system augurs intense litigation over the very premise of such an award, that is, whether a case is frivolous or flagrant. Such synergistic circumstances would greatly increase the number and complexity of cases before the Board, and what began as a means of ridding the Board and the courts of frivolous cases (which are relatively few in number) would finally produce quite the opposite result and add greatly to the Board's burdens.
 I would require a more clearly expressed statutory mandate to authorize the Board to order a remedy in which even the courts seldom indulge.
 
 
 [14]
 155 U.S.App.D.C. at 106, 476 F.2d at 551
 
 
 [15]
 Id
 
 
 [16]
 We are, of course, cognizant of the somewhat disturbing circularity of this approach-- the Board reacted to the strong remand in Tiidee I by imposing attorney fees, Food Store then relied on the Board's supplemental decision in Tiidee I after our remand, and now we, in Tiidee III, rely in large part on the precedent established by Food Store to sustain the imposition of attorney fees and other litigation expenses
 16A Although it is the law of this case, it is my individual opinion (see note *, supra) that the Company's conduct of this litigation is not as frivolous as the adjectival characterizations of the Tiidee I majority would suggest. The Company had a legitimate complaint against the Union's circulation of a misrepresentative handbill to the employees on the very day of the election, just eight hours prior to the balloting. The handbill misrepresented the issues in the election by holding out the alluring promise that 'greater benefits' were 'exactly' what a 'Yes vote' would produce. Report on Election, Exhibit A, Jt.App. at 220. Board decisions, however, generally allow unions some latitude in this area, to the extent that they may promise benefits they may be unable to procure. See e.g., Burson Plant of the Kendall Co., 115 NLRB 1401 (1956); Olson Rug Co., 118 NLRB 1274 (1957). The interjection of such misrepresentative matter at the last minute so that the employer cannot respond, however, must be viewed in a different light. In this context, the Company justifiably could feel unfairly treated on the significant question of whether it would be unionized. But for the late hour at which the handbill was distributed, the Company could and probably would have responded with a handbill of its own to inform the employees of the precise implications of a 'Yes vote' in the election.
 The obvious strategical move, calling a meeting of the employees to answer the Union's misleading literature in a speech, was prohibited by the Peerless Plywood rule. Peerless Plywood Co., 107 NLRB 427 (1953). Under Peerless, while 'unions or employers (may) circulate campaign literature on or off the premises at any time prior to an election,' id. at 430, they are 'prohibited from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election.' Id. at 429. Thus the Company was effectively precluded from answering what it considered to be unfair and misleading campaign propaganda and tactics, the obvious purpose and intent of which was to influence the election against the Company.
 When the election resulted in a union victory, the Company naturally and justifiably inferred that the misleading campaign propaganda had influenced the result to some degree. The Company undoubtedly thought that in logic and reality such last minute handbilling is indistinguishable from last minute speeches, which the Board has recognized 'tends to create a mass psychology (and is) the last most telling word.' Id. Mousetrapped between the 24 hour nospeech rule and the rule permitting unions to propagandize up to the time of balloting, the Company felt it imperative to make legal objections to the election. The Regional Director investigated, but did not hold any hearing on the Company's objections and ruled against the Company. He found that the Union's handbill's did not influence the election result, a conclusion contrary to the obvious effect intended by the Union. It may be cogently argued that a hearing was necessary in order to determine the psychological and practical effect of the Union's handbilling immediately prior to the election. Employees could have been called to determine whether they thought that as a result of a union victory they would be guaranteed greater benefits as the literature promised. The Trial Examiner almost casually termed as 'frivolous' the Company's failure to acquiesce to the Regional Director's decision, even though the Company's refusal to bargain was the only method under the Act by which it could seek review of that decision. The trial examiner would have to have been prescient to realize he was opening a Pandora's box of complex and protracted litigation by this casual reference, when subsequently the Tiidee I majority greatly expended his factual finding to make the Company's position 'palpably' and 'patently' frivolous. See text following this note. Viewed in total context, one could not fairly characterize as frivolous the actions taken by the Company; the Company's conduct, moreover, could hardly be termed any more frivolous than the Union's demand for a remedy never previously ordered in the entire 39-year history of the Act and still thought by the Board not to be within its power under section 10(c) to grant.
 The analysis of Chairman Miller of the NLRB in his dissent in Tiidee II supports his conclusion that the Company's defenses in that case had not been 'asserted frivolously.' His dissenting opinion stated:
 As the majority opinion points out, our decision in Tiidee I to award costs and attorneys' fees was based on the court's finding that the litigation there had been frivolously engaged in by Respondent.
 In reviewing the record in the instant case, I am unable to find that the defense here was asserted frivolously. The majority opinion here seems to me to evade this issue and to rely on the extent of Respondent's unfair labor practices (which, however reprehensible, are no more extensive than those committed by both unions and employers in a considerable percentage of the 800 or so cases we review each year) and on the degree of Respondent's union animus and hostility. But the degree of Respondent's hostility has little or nothing to do with the frivolity of its defenses to the allegations of the complaint in this proceeding.
 For these reasons I dissent from that portion of this Decision which awards costs and attorneys' fees.
 
 
 [196]
 NLRB at 157. The italicized statement is equally applicable to the court's majority opinion in Tiidee I
 Although I recognize that the Company faced a very difficult position so far as the Board and its decisions were concerned, I also believe that the Company had legitimate grounds for considering as a matter of simple justice that it did have a valid complaint against the Union. To dispose of the Company's complaint, as the trial examiner did, by the statement that the handbill did not influence the election, is completely speculative and denies that the handbill had the very effect that its authors and distributors intended it to have.
 
 
 [17]
 Tiidee I, supra note 2, at 254, 426 F.2d at 1248
 
 
 [18]
 Id
 
 
 [19]
 Id. at 255, 426 F.2d at 1249
 
 
 [20]
 Id. at 256, 426 F.2d at 1250
 
 
 [21]
 Id
 
 
 [22]
 The American rule generally disfavors the award of attorney fees and other litigation expenses except where specifically provided for by statute or contract. Hall v. Cole, 412 U.S. 1, 4, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). See, e.g., Clayton Act, 4, 15 U.S.C. 15 (1970); Interstate Commerce Act, 16, 49 U.S.C. 16(2) (1970); Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1880). Food Store, supra, has established for this circuit that the power to award attorney fees does repose in section 10(c), i.e., that the statute here is within the recognized exception to the general rule. As a matter of guiding principle we note, however, that the rationales underlying the traditional rule, see Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages,
 
 
 [15]
 Minn.L.Rev. 619, 639-40 (1931), are soundly applicable only in cases involving meritorious or colorable legal claims and defenses. See Amalgamated Local Union 355 v. NLRB, 481 F.2d 996 (2d Cir. 1973)
 
 
 [23]
 The Tiidee I court was concerned that such frivolous litigation as that engaged in by the Company would 'drain and divert judicial resources from the provision of justice to the crowded calendars and to meritorious litigants whose claims clamor for attention. The same considerations are presumably applicable at the administrative level.' Supra note 2, at 256, 426 F.2d at 1250. In this respect, it would be disingenuous to fail to recognize explicitly that the litigation expenses remedy has a deterrent aspect and thus arguably falls within the ambit of Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). The instant case, however, presents somewhat different factual circumstances and the award of legal expenses, at least to the Union, may more cogently be described as remedial. See note 24 infra. This assertion assumes the proportions of semantic jousting, but the cavil may be raised as to any 'remedial' order that it also has an impermissible deterrent effect
 If Food Store, supra, is to be relied upon, however, this does not preclude its use where its primary thrust is truly remedial.
 
 
 [24]
 Frivolous litigation on a protracted basis might be so burdensome financially as to interfere seriously with the ability of the affected party to function and act effectively. In such circumstances, the claim is made that this remedy in part may also be designed to restore the injured party to the status quo ante, a well recognized goal of the Board's remedial powers. Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Decaturville Sportswear Co. v. NLRB, 406 F.2d 886, 889 (6th Cir. 1969); Local 57, International Ladies' Garment Workers' Union, AFL-CIO v. NLRB, 126 U.S.App.D.C. 81, 86, 374 F.2d 295, 300, cert. denied, 387 U.S. 942, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967); see Local 60, United Brotherhood of Carpenters & Joiners of America v. NLRB, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). The award of attorney fees based on this principle, however, greatly exceeds the manner in which it normally has been applied by the Board and the courts
 
 
 [25]
 155 U.S.App.D.C. at 102, 476 F.2d at 547. See also text accompanying notes 14-15 supra
 
 
 [26]
 See text accompanying note 13 supra. Thus the law of the case also dictates that an award of legal expenses to the Board exceeds 'the scope of the Board's consideration on remand.' Id
 26A It is my individual opinion, again in which my brothers do not join, that an award of attorney fees and other litigation expenses to the Board itself falls within the prohibition of Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), which precludes the use of a pure deterrence rationale as a basis for upholding orders under section 10(c). In Republic Steel the Board ordered an employer to deduct from payments to employees reinstated with back pay amounts they had earned on public work relief projects and to pay such deducted amounts to the appropriate government agencies. The Court characterized such payments as 'exactions' and stated that
 it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end.
 Id. at 12. Since the NLRB was created and exists for the purpose of determining unfair labor practice cases and otherwise discharging its duties under the Act, reimbursement to the Board of legal expenses incurred in the discharge of its statutory duties under section 10(c) could only be justified on the impermissible rationale of deterrence. By contrast, this court has held that the Board may be reimbursed for attorney fees and other litigation expenses by a United States Court of Appeals in an action in which the Board has successfully petitioned such court to hold in civil contempt a party who has violated that court's final order granting enforcement to a Board order. Dallas General Drivers, Warehousemen and Helpers, Local Union No. 745 v. NLRB, 163 U.S.App.D.C. 100, 500 F.2d 768 (1974); West Texas Utilities Co. v. NLRB, 92 U.S.App.D.C. 224, 206 F.2d 442, cert. denied, 346 U.S. 855, 74 S.Ct. 70, 98 L.Ed. 369 (1953).
 
 
 [27]
 Company Br. at 9, 17-18
 
 
 [28]
 The union demand, made originally before the trial examiner, was that the
 Respondent (Company) make the employees whole for wages and benefits which they might have received but for the Respondent's unlawful refusal to bargain, and that the Respondent be required to pay the Union the amount of dues and initiation fees it lost dating from 130 days after the Union was certified.
 Jt.App. at 48.
 
 
 [29]
 The Board stated in its supplemental decision in Tiidee I:
 In Ex-Cell-O the Board majority enunciated its conclusion that Congress did not give the Board statutory authority to grant the compensatory monetary remedy requested by the Union. The court of appeals disagreed with this view of the scope of the Board's statutory remedial power and it remanded these cases to the Board for further proceedings not inconsistent with the court's opinion. Although the Board adhers to the views expressed in Ex-Cell-O, inasmuch as it has accepted the remand, it considers itself bound by the court's opinion as the 'law of the case.'
 
 
 [194]
 NLRB at 1234
 
 
 [30]
 Tiidee Products, Inc., 196 NLRB 158 (1972); Jt.App. at 126
 
 
 [31]
 Tiidee I, supra note 2, at 259, 426 F.2d at 1253
 
 
 [32]
 Id. at 257, 426 F.2d at 1251
 
 
 [33]
 Jt.App. at 135, 144-69
 
 
 [34]
 Id
 
 
 [35]
 Tiidee Products, Inc., 194 NLRB 1234, 1235 (1972)
 
 
 [36]
 Id
 
 
 [37]
 Id
 
 
 [38]
 Id. at 1234
 
 
 [39]
 The Board declined to remand the case to a trial examiner to attempt to gather further evidence on the make-whole remedy. It found that such action would be 'counterproductive' and that it would not effectuate the policies of the Act to do so. Id. at 1235. The Company was under order to bargain with the Union and thus would not be likely to agree to any contract that might serve as a basis for establishing make-whole relief. Also, the Union had already had full opportunity to present such evidence. See text accompanying note 33 supra
 
 
 [40]
 Our limitation on the legal expenses recoverable by the Union does detract somewhat from the implicit balancing process in which the Board appears to have engaged, but we think that the clear dictates of the law, combined with the additional affirmative actions required of the Company, satisfactorily resolve the complex of problems presented in this case
 
 
 [41]
 Tiidee Products, Inc., 194 NLRB 1234, 1236 (1972)
 
 
 [42]
 Id
 
 
 [43]
 Food Store Employees Union, Local No. 347 v. NLRB, 155 U.S.App.D.C. 101, 107, 476 F.2d 546, 552, cert. granted, 414 U.S. 1062, 94 S.Ct. 567, 38 L.Ed.2d 467 (1973). The court also noted with approval the second ground asserted by the Board in the instant case to deny payment of dues and fees. Id. at 107 n. 10, 476 F.2d at 552 n. 10
 
 
 [44]
 Union Br. at 32
 
 
 [45]
 Id
 
 
 [46]
 Tiidee Products, Inc., 194 NLRB 1234, 1236 (1972)
 
 
 [47]
 155 U.S.App.D.C. at 106, 476 F.2d at 551
 
 
 [48]
 Tiidee Products, Inc., 174 NLRB 705, 714, 705-06 (1969); NLRB Br. at 33 n. 40
 
 
 [49]
 International Union of Elec. Workers v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970)
 
 
 [50]
 See H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). The power to hold the employer in contempt of the Board does not mitigate the past effects on the employees of the refusal to bargain
 
 
 [51]
 See International Union of Elec. Workers v. NLRB, 138 U.S.App.D.C. 249, 257-258, 426 F.2d 1243, 1251-1252, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970). See also Sullivan v. Murphy, 156 U.S.App.D.C. 28, 60-61 n. 74, 478 F.2d 938, 970-971 n. 74, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973)